**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2869-16T1

COMMITTEE OF PETITIONERS
TO PROTEST THE ADOPTION
OF ORDINANCE NO. 2016-01,
KENNETH E. PRINGLE, THOMAS
P. FAHY, LINDA SHARKUS,
LINDA CHELSEN, and KATRINA
CLAPSIS,

     Plaintiffs-Respondents,

v.

BOROUGH OF BELMAR,
MAYOR & COUNCIL OF THE
BOROUGH OF BELMAR, APRIL
CLAUDIO, Municipal Clerk of
the Borough of Belmar, and COLLEEN
CONNOLLY, Business Administrator
of the Borough of Belmar,

     Defendants-Appellants.

_____

Argued September 21, 2018 – Decided April 24, 2019

Before Judges Simonelli, O'Connor and DeAlmeida.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1392-16.

Ramon E. Rivera argued the cause for appellants (Scarinci & Hollenbeck LLC, attorneys; Ramon E. Rivera, of counsel and on the brief; Shana T. Don and Craig A. Long, on the brief).

Kenneth E. Pringle argued the cause for respondents (Pringle Quinn Anzano, PC, attorneys; Kenneth E. Pringle, of counsel and on the brief; Denise M. O'Hara, on the brief).

PER CURIAM

Plaintiffs Committee of Petitioners to Protest the Adoption of Ordinance No. 2016-01 (Committee), Kenneth E. Pringle, Thomas P. Fahy, Linda Sharkus, Linda Chelsen and Katrina Clapsis were the prevailing parties in an action challenging an ordinance they believed weakened or eliminated the protections afforded by prior ordinances governing potential conflicts of interest arising from so-called "Pay-to-Play" campaign contributions. Defendants the Borough of Belmar (Borough), Mayor and Council of the Borough, April Claudio, and Colleen Connolly,[1] appeal from the November 10, 2016 and January 26, 2017 Law Division orders, which awarded attorney's fees and costs to plaintiffs under

---

[1] Claudio is the Borough's Municipal Clerk and Connolly is the Business Administrator.

the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2.  For the reasons that follow, we affirm.

I.

Pringle was an individual plaintiff and member of the Committee.  He was also a partner in the law firm of Pringle Quinn Anzano, PC (PQA), which represented plaintiffs in this matter.  Pringle signed the certification verifying the complaint filed on behalf of all plaintiffs, and he and his associate, Edward R. Bonanno, Esq., were designated as trial counsel.  Another PQA associate, Denise M. O'Hara, also worked on the case.

The parties engaged in extensive motion and appellate practice during the course of this litigation.  Because this appeal only involves the award of attorney's fees, we focus on that part of the record relating to the fee award.

PQA filed a motion for a lodestar fee of $89,820, a forty percent contingency enhancement, and $734.22 for costs.  In support thereof, PQA submitted certifications from Pringle, Bonanno, O'Hara, and an expert, Charles J. Uliano, Esq.  PQA also submitted an invoice showing the hourly rates charged and services rendered by each PQA attorney.

According to Pringle, PQA represented plaintiffs in other public interest matters involving the Borough under the express understanding "that PQA's

representation would be at no cost to them as clients, but that in the case of the affirmative litigation matters, [PQA] reserved the right to seek to recover [its] fees and costs from the Borough . . . to the extent allowed by law." PQA never had a written retainer agreement with any of its public interest clients, including plaintiffs, because PQA represented them on the express understanding that PQA would not seek a fee from them and because the relief sought in these matters was equitable in nature. In addition, PQA

> made clear to [its] clients verbally that [PQA] would be relying upon the decision in Tumpson [v. Farina, 218 N.J. 450 (2014)] to assert claims that the Borough's conduct violated the [NJCRA], and that if [PQA was] successful, [PQA] would be seeking an award of [its] reasonable attorneys' fees and costs pursuant thereto.

Pringle also certified that PQA charged $300 per hour for his services, $250 per hour for Bonanno's services, and $225 for O'Hara's services, which reflected the hourly rates PQA charged to its non-insurance company clients for litigation matters. Pringle stated these hourly rates were comparable to the rates other litigation attorneys in Monmouth County customarily charged and were low in comparison to the rates charged by Monmouth County attorneys who have comparable levels of skill, background and litigation experience as the PQA attorneys. Pringle reviewed the time entries on the invoice and eliminated charges he determined were duplicative, inefficient, or otherwise unnecessary

under the circumstances of this case, or were arguably unreasonable for the service described or not sufficiently detailed to enable him or the court to assess whether the charges were reasonable.

Uliano opined that the hourly rates PQA charged and the services rendered in this matter were reasonable under RPC 1.5 and the guidelines established in <u>Rendine v. Pantzer</u>, 141 N.J. 292 (1995) and <u>Walker v. Giuffre</u>, 209 N.J. 124 (2012). Uliano stated the hourly rates PQA charged were lower than the prevailing market rate in Monmouth County for an adequately experienced attorney possessed of average skill and ordinary competence. He also stated the hourly rates PQA charged were significantly lower than what civil litigation attorneys of comparable backgrounds, skills and levels of experiences charged in Monmouth County, as reflected in the PQA attorneys' biographies and the quality of the submissions to the court.

Uliano reviewed the invoice and noted the numerous time entries Pringle eliminated because they were duplicative, unproductive, and otherwise not appropriately billed under RPC 1.5. Uliano concluded that for an average Monmouth County law firm to successfully litigate a case of this type against a municipality, the firm would have to expend at least the amount of time the PQA attorneys spent in this matter.

Defendants did not submit any certifications or documents countering Pringle's and Uliano's certifications. Rather, they argued that plaintiffs were not entitled to a fee award because there was no retainer agreement for this contingency matter, as required by RPC 1.5 and Rule 1:21-7, and PQA provided the services on a pro bono basis. Defendants noted that more than half of the fee sought related to the services Pringle performed, and without a retainer agreement specifying the scope of services, it was difficult to assess whether he or any other attorney was acting on his behalf or on behalf of the other plaintiffs. Defendants posited that if Pringle was acting on his own behalf, plaintiffs were not entitled to attorney's fees under the NJCRA, as Pringle was essentially appearing pro se. Defendants further argued there should be no fee award because plaintiffs did not actually incur legal fees. In the alternative, defendants argued the court should reduce the fee sought by one-fifth because a pro se attorney is not entitled to recoup fees. Defendants also stated the hourly rates charged and services rendered were not reasonable.

In a November 3, 2016 oral opinion, the motion judge disagreed with defendants' argument that PQA was not entitled to a fee award because there was no written retainer agreement. The judge found there was no evidence of any misunderstanding between plaintiffs and PQA as to PQA's agreement not to

A-2869-16T1

take payment from plaintiffs directly but reserving the right to pursue all legally allowed fees. The judge determined that to award no fees was contrary to the Legislature's intent to permit a fee award under the NJCRA, and would have the effect of discouraging attorneys from taking on matters of public importance, such as this one, where the only possibility for a fee award is by statute. The judge also found that the lack of a retainer agreement did not affect her ability to analyze the certifications and invoice to determine whether the fee sought was reasonable.

The judge also disagreed that Pringle's role in the case deprived plaintiffs of their statutory right to a fee award in whole or in part. The judge found that Pringle was not acting pro se, but rather, PQA represented all plaintiffs, and Pringle's status as a member of the firm, a member of the Committee, and an individual plaintiff did not strip plaintiffs of their statutory right to an award of reasonable attorney's fees.

The judge found that plaintiffs would have incurred the same fees and the same work would have been performed on their behalf regardless of whether Pringle was a plaintiff or a Committee member. The judge disagreed that it was impossible to determine what services Pringle rendered as an attorney or in a witness capacity, and found the distinction was readily discernible by a review

A-2869-16T1

of the invoice, which eliminated charges for services he rendered as a fact witness. The judge also noted defendants failed to cite any authority supporting their argument.

As for the reasonableness of the rates PQA charged, the judge found defendants submitted no certifications to refute Pringle's and Uliano's certifications and merely made bald assertions that the rates were unreasonable. The judge also noted that the Borough had once retained the Gibbons law firm at a blended rate of $450 per hour, which was significantly higher than the rates PQA charged in this matter. The judge further noted there was a distribution of the work among the PQA attorneys, with some work done at an associate's rate versus a partner's rate, and Uliano opined the rates PQA charged were reasonable and significantly lower than what Monmouth County civil litigation attorneys charged. The judge concluded the rates PQA charged were reasonable.

As for the reasonableness of the services rendered, the judge found that given the nature of the case, it was reasonable for more than one attorney to work on it. However, the judge reviewed the invoice and reduced the charges for duplicative or excessive work, work that PQA should have billed at a lower rate, and unnecessary work. The judge was able to determine the reasonableness of the time spent for a particular activity regardless of defendants'

characterization of the entry as block billing. The judge concluded the services rendered were reasonable and awarded plaintiffs a lodestar fee of $87,270.

The judge also awarded a forty percent contingency enhancement, finding PQA achieved a high degree of success, there was a high risk of non-payment to the firm, and the matter was of a high degree of public importance. The judge considered all of the factors in Rule 4:42-9, RPC 1.5(a), Rendine, Walker, and other applicable case law in reaching this conclusion. In a November 10, 2016 order, the judge awarded a total fee of $122,178 plus $734.22 for costs.

Plaintiffs subsequently filed a motion for a lodestar fee of $9795 plus $179.90 for costs incurred on appeal, supported by an invoice and certifications from the PQA attorneys and Uliano. Defendants submitted a certification from their attorney stating the hourly rates his firm charged municipal entities in public interest matters, which were lower than the rates PQA charged in this matter.

In a January 12, 2017 oral opinion, the judge found that PQA's hourly rates were reasonable and consistent with those of attorneys with reasonably comparable skill, experience and reputation in the community. The judge recited the procedural history of this case to emphasize the rapid sequence of events and the extensive work that PQA performed in a relatively short time, as

well as the need for skilled, experienced attorneys working on this matter. The judge determined that the lower rates defendants' attorney charged to municipal entities were not dispositive of the reasonableness and appropriateness of the rates PQA charged. The judge concluded that the information plaintiffs provided regarding the experience and skill of the PQA attorneys, as supported by Uliano, confirmed the rates PQA charged on appeal were reasonable.

The judge reviewed the invoice and reduced the amount sought to $9,656.15. The judge also found plaintiffs were entitled to $179.90 for costs because defendants did not dispute them. The judge entered an order on January 26, 2017, memorializing the award. This appeal followed.

## II.

"We review fee determinations by trial courts with deference and will disturb them 'only on the rarest occasions, and then only because of a clear abuse of discretion.'" DeSanctis v. Borough of Belmar, 455 N.J. Super. 316, 335 (App. Div. 2018) (quoting Rendine, 141 N.J. at 317). "In our review of fees awarded pursuant to fee-shifting provisions, we do consider whether the trial court 'sufficiently address[ed] the factors or the framework that [our Supreme Court] established in Rendine.'" Ibid. (alterations in original) (quoting Walker, 209 N.J. at 148). "The Court reposed discretion in trial courts to establish any

contingency enhancement in fee-shifting cases." Ibid. (quoting New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corr., 185 N.J. 137, 158 (2005)). We discern no abuse of discretion here.

An award of attorney's fees is permitted "[i]n all cases where attorney's fees are permitted by statute." R. 4:42-9(a)(8). The NJCRA permits an award of reasonable attorney's fees and costs to the prevailing party. N.J.S.A. 10:6-2(f); see also Tumpson, 218 N.J. at 479. Defendants argue that PQA, of which Pringle was a member, is not entitled to recoup its fees because a pro se attorney may not receive a fee award under the NJCRA, and an attorney acts pro se even when representing additional parties.

To support these arguments, defendants cite to unpublished opinions from this court, a published trial court opinion, an unpublished out-of-state lower court opinion, and published opinions from federal courts. However, these opinions do not constitute precedent or bind us. See Lipkowitz v. Hamilton Surgery Ctr., LLC, 415 N.J. Super. 29, 36 (App. Div. 2010); Trinity Cemetery Ass'n v. Twp. of Wall, 170 N.J. 39, 48 (2001); Meadowlands Basketball Assoc. v. Dir., Div. of Taxation, 340 N.J. Super. 76, 83 (App. Div. 2001); R. 1:36-3.

The published opinions defendants cite, Kay v. Ehrler, 499 U.S. 432 (1991) and Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510 (App. Div. 2009), do not support their arguments.

In Kay, an attorney filed a successful action on his own behalf challenging the constitutionality of a Kentucky statute and requested a fee award under 42 U.S.C. § 1988. 499 U.S. at 434. The United States Supreme Court, in construing the provisions of 42 U.S.C. § 1988, concluded that an attorney representing himself or herself cannot claim the benefits of that statute's attorney's fees provision. Id. at 437-38. The Court's reasons for that conclusion reveal its preference for encouraging all litigants to engage the services of independent counsel. As such, the Court commented on the need for even a pro se attorney to have counsel capable of "framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and . . . making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom." Id. at 437. Thus, the Court concluded that allowing pro se attorney litigants to secure an award of attorney's fees would create an unwanted disincentive for attorneys to hire counsel. Id. at 438.

A-2869-16T1

In <u>Alpert</u>, a law firm represented itself in litigation against former clients for attorney's fees, expenses and collection fees under a retainer agreement and as a sanction under <u>Rule</u> 1:4-8(d)(2). 410 N.J. Super. at 526-28. We held that counsel proceeding pro se cannot recover attorney's fees for frivolous litigation because <u>Rule</u> 1:4-8 "specifically permits only the reimbursement of attorneys' fees and expenses incurred by a party. It does not permit the reimbursement of a party's loss of income in dealing with frivolous litigation." <u>Id.</u> at 545. We explained this reasoning also applied to attorneys appearing pro se, because "[t]o compensate an attorney for his lost hours would confer on the attorney a special status over that of other litigants who may also be subject to frivolous claims and are appearing pro se." <u>Id.</u> at 546. Thus, we concluded that "an attorney appearing pro se is not entitled to fees unless they are actually incurred as opposed to imputed." <u>Id.</u> at 547. We noted, however, that our holding was "directed solely to the language of <u>Rule</u> 1:4-8(d)(2)" and did not deal with "the award of fees otherwise authorized by contract, rule, or statute." <u>Id.</u> at 546 n.8.

The distinction between <u>Kay</u> and <u>Alpert</u> and the case here is that Pringle was not acting pro se, representing only himself and his own interests. Rather, a law firm represented him as well as the other plaintiffs, and the law firm was not a party to the litigation. Thus, <u>Kay</u> and <u>Alpert</u> do not control here.

13

We are satisfied the judge properly determined that Pringle's status as a member of PQA, a member of the Committee, and an individual plaintiff did not strip plaintiffs of their statutory right to reasonable attorney's fees. Pringle was not acting pro se with respect to the work he performed as an attorney because he was not representing only himself, but four other members and the Committee of which all plaintiffs were members. As such, regardless of whether or not Pringle was a plaintiff, he would have generated the same amount in fees and work in this matter. Pringle's membership on the Committee did not confer upon him any responsibilities or benefits that were different from any of the other plaintiffs. Rather, the claims plaintiffs were collectively pursuing were entirely equitable in nature and served to benefit the Borough of Belmar electorate as a whole.

Second, none of the policy considerations in support of denying attorney's fees to pro se attorneys apply here and they should not be extended to situations where the plaintiff-attorney also represents other co-plaintiffs. There is no evidence that Pringle prolonged the litigation to generate more fees or filed frivolous claims or motions. Instead, the record confirms that Pringle obtained the relief plaintiffs sought in the verified complaint, filed a successful summary

14

judgment motion and motions to enforce compliance with court orders, and obtained a swift resolution of this matter.

By representing plaintiffs and himself, Pringle did not take advantage of a remedy meant to help ordinary citizens obtain competent representation. Fee-shifting statutes are enacted so "that plaintiffs with bona fide claims are able to find lawyers to represent them[,] . . . to attract competent counsel in cases involving statutory rights, . . . and to ensure justice for all citizens." New Jerseyans for a Death Penalty Moratorium, 185 N.J. at 153 (alteration in original) (quoting Coleman v. Fiore Bros., Inc., 113 N.J. 594, 598 (1989)). As a result of this fee-shifting provision, Pringle was able to provide competent representation to the other plaintiffs who were not attorneys because his firm could not have afforded to undertake representing plaintiffs in this case were it not for the holding in Tumpson, which afforded them the right to recover their reasonable fees and costs if they prevailed.

The fact that Pringle did not expect to be paid at all, and the amount of the award, do not affect the nature of the fee award because "the reasonable counsel fee . . . under fee-shifting statutes is determined independently of the provisions of the fee agreement between [the] party and his or her counsel. The statutory fee award may be comparable to or substantially different from the amount

15

payable under a negotiated fee agreement." Id. at 156 (alteration in original) (quoting Szczepanski v. Newcomb Med. Ctr., Inc., 141 N.J. 346, 358 (1995)). Thus, given that the statutory fee award is not dependent on the provisions of a fee agreement, we find no merit in defendants' argument that the attorney's fees would not have been the same had Pringle not been a plaintiff because PQA was charging the pro bono matter at private client rates.

Furthermore, the fee award did not create a windfall for PQA because the relief sought was entirely equitable in nature and plaintiffs were entitled to reasonable attorney's fees and costs under the fee-shifting provision of the NJCRA. The award also did not create two distinct classes of pro se litigants who are each afforded different remedies because PQA incurred fees in connection with its representation of both the plaintiff-attorney and the non-attorney plaintiffs in the same matter. Thus, unlike in Alpert, 410 N.J. Super. at 546-47, Pringle was not being compensated for lost hours or fees that were imputed, but for fees actually incurred, as he represented parties other than himself.

Unlike in Kay, 499 U.S. at 437-38, an attorney-client relationship existed between Pringle and other plaintiffs, and thus, Pringle was not acting solely pro se with a personal interest in the outcome of the case. The interest in this case

16

was equitable in nature and benefited the whole Borough of Belmar electorate, making Pringle a disinterested and independent party similar to any of the other plaintiffs. Thus, PQA is entitled to fees generated in pursuing the claims asserted in this matter on behalf the other plaintiffs, which were the same claims Pringle made against defendants generating essentially the same fees.

## III.

Defendants contend the judge erred by disregarding the prevailing hourly rate in the entire State of New Jersey, arguing the judge should have taken judicial notice of the prevailing rates in public sector legal market charged statewide, as reflected in municipal resolutions appointing attorneys. Defendants also argue the judge should have compared the rates PQA charged with a comparable firm, and that attorneys practicing municipal law charge between $150 and $220 per hour.[2] This argument lacks merit.

In <u>Rendine</u>, 141 N.J. at 292, and <u>Szczepanski</u>, 141 N.J. at 346, the Court addressed the issue of calculation of a reasonable attorney's fee payable under fee-shifting statutes to the prevailing party. Although occasioned by cases involving fee-shifting legislation, such as the New Jersey Law Against

---

[2]  Again, defendants cite to a federal court opinion to support this argument, which does not constitute precedent or bind us.

17

Discrimination in <u>Rendine</u> and <u>Szczepanski</u>, these standards have been applied in situations where the prevailing party is entitled to a fee award. <u>See</u> <u>Incollingo v. Canuso</u>, 297 N.J. Super. 57, 63-64 (App. Div. 1997). The Court declared that conformance with the standards announced in <u>Rendine</u> and <u>Szczepanski</u> would permit "future fee determinations . . . [to] be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion." <u>Rendine</u>, 141 N.J. at 317.

In <u>Rendine</u>, the Court explained that the trial judge must first "determine the lodestar, 'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" <u>Id.</u> at 333-34 (quoting <u>Singer v. State</u>, 95 N.J. 487, 499 (1984)). This requires the "court to evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party . . . ." <u>Id.</u> at 335. Time not reasonably expended should be excluded. <u>Ibid.</u> "A reasonable hourly rate it to be calculated according to the prevailing market rates in the relevant community." <u>Id.</u> at 337 (quoting <u>Rode v. Dellaciprete</u>, 892 F. 2d 1177, 1183 (3d Cir. 1990)). In general, a reasonable hourly rate is one "that would be charged by an adequately experienced attorney possessed of average skill and ordinary competence − not those that would be

set by the most successful or highly specialized attorney in the context of private practice." Walker, 209 N.J. at 132-33 (quoting Singer, 95 N.J. at 500-01).

The same standard applies when attorneys undertake representation without expectation of payment. See New Jerseyans for a Death Penalty Moratorium, 185 N.J. at 156 (holding that a reasonable counsel fee is determined independent of the fee arrangement between a party and counsel and stating that an attorney's expectation of payment has no bearing on the fee award); see also BJM Insulation & Constr., Inc. v. Evans, 287 N.J. Super. 513, 517 (App. Div. 1996) (stating that the terms under which an attorney has agreed to provide representation to a client "is none of [the obligor party's] business").

Here, the judge acted within her discretion in finding PQA's rates were reasonable based on Uliano's and Pringle's uncontroverted certifications. The judge correctly determined that PQA's rates were not only reasonable, they were significantly lower than what civil litigation attorneys in Monmouth County charge.

The judge found that PQA's rates on appeal were reasonable and consistent with those of attorneys with reasonably comparable skill, experience and reputation in the community. The judge also found the rates were reasonable and consistent given the information provided by the PQA attorneys

regarding their experience and skill, as supported by their expert's review and as demonstrated by the quality of the work they performed.

The judge's findings are supported by sufficient credible evidence in the record, and thus are owed deference. Contrary to defendants' assertion that the relevant market constitutes the entire State of New Jersey, in the lodestar method, "the number of hours reasonably expended by counsel is multiplied by an hourly rate appropriate for the region and the lawyer's experience." Sutter v. Horizon Blue Cross Blue Shield of N.J., 406 N.J. Super. 86, 104 (App. Div. 2009) (emphasis added). The court should evaluate counsel's rates "in comparison to rates 'for similar services by lawyers of reasonably comparable skill, experience, and reputation' in the community." Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 22 (2004) (quoting Rendine, 141 N.J. at 337).

Uliano certified that each PQA attorney's rate was lower than the prevailing market rate charged by Monmouth County civil litigation attorneys of comparable backgrounds, skills and levels of experience. Because Uliano's opinion considered the prevailing rate in Monmouth County, where PQA is located and the litigation ensued, the quality or nature of the legal services the attorneys rendered and their experience, as reflected in their biographies, the

20

judge did not err in relying upon Uliano's opinion to find PQA's rates were reasonable.

Defendants provided no evidence of the prevailing rates in New Jersey for civil litigation attorneys, nor did they refute Uliano or Pringle's certifications, instead arguing that their attorney's rates were much lower. However, the rates charged by defendants' attorney are not dispositive because defendants do not indicate what the prevailing rate is for legal services similar to the services PQA provided. The rates of defendants' attorney are only indicative of the prevailing rates of attorneys representing the Borough. Thus, the judge properly found that comparing PQA's rates to defendants' attorney's rates was insufficient. One law firm's decision to charge lower rates for certain types of clients or in particular cases is not dispositive of the prevailing rate of attorneys of comparable skill, experience, and reputation in the relevant community. Accordingly, the judge acted within her discretion in finding Monmouth County represented the relevant community and the rates PQA charged were reasonable.

We reject defendants' request to take judicial notice of municipal resolutions appointing counsel to determine the reasonable hourly rate prevailing in the relevant community. "The purpose of judicial notice is to save time and promote judicial economy by precluding the necessity of proving facts

that cannot seriously be disputed and are either generally or universally known." State v. Silva, 394 N.J. Super. 270, 275 (App. Div. 2007). On appeal, we have the discretion to "take judicial notice of any matter specified in Rule 201, whether or not judicially noticed by the [trial] judge." N.J.R.E. 202(b); see Marchak v. Claridge Commons, Inc., 261 N.J. Super. 126, 131-32 (App. Div. 1992). The subject matter that may be judicially noticed is set forth in Rule 201(b):

> (b) Notice of facts. Facts which may be judicially noticed include (1) such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute, (2) such facts as are so generally known or are of such common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute, (3) specific facts and propositions of generalized knowledge which are capable of immediate determination by resort to sources whose accuracy cannot reasonably be questioned, and (4) records of the court in which the action is pending and of any other court of this state or federal court sitting for this state.
>
> [N.J.R.E. 201(b).]

Essentially, facts that can be reasonably questioned or disputed may not be judicially noticed. Ibid.

In this case, taking judicial notice of the rates attorneys charge municipalities does not support the proposition that their rates are indicative of

the prevailing rates for attorneys who provide similar services and are of reasonably comparable skill, experience, and reputation as plaintiffs' attorneys. The municipal resolutions may indicate what municipalities are willing to pay attorneys, but they do not indicate what attorneys charge private citizens in lawsuits against municipalities or that the rates listed in the resolutions are the prevailing rates for legal services similar to that which PQA provided to plaintiffs.

IV.

Defendants contend the judge erred in finding that the absence of a retainer agreement did not preclude a fee award because under Rule 1:21-7(c), contingency agreements in tort matters must be memorialized in writing and there is no case law addressing the waiver of the retainer agreement requirement because of a fee-shifting statute. We rejected this argument in DeSanctis, 455 N.J. Super. at 335, and reject it again here.

The judge did not err by awarding fees in the absence of a written retainer agreement. In New Jerseyans for a Death Penalty Moratorium, 185 N.J. at 156, the Court held that a reasonable counsel fee is determined independent of the fee arrangement between a party and counsel and stated that an attorney's expectation of payment has no bearing on the fee award. See also BJM

Insulation & Constr., Inc., 287 N.J. Super. at 517 (stating that the terms under which an attorney has agreed to provide representation to a client "is none of [the obligor party's] business"). In New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corr., 370 N.J. Super. 11, 15 (App. Div. 2004), we affirmed the enhancement the trial court awarded where the plaintiff's firm provided legal services pro bono without the benefit of any written retainer agreement. We reasoned that "the possibility of compensation, i.e. contingent compensation, inheres in the existence of the fee-shifting provision." Ibid.

In construing the federal civil rights act on which the NJCRA is patterned, the Supreme Court in Venegas v. Mitchell, 495 U.S. 82, 90 (1990), noted that the fee-shifting provision "controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer[,]" distinguishing retainer agreements from what prevailing parties are entitled to under fee-shifting statutes and noting that they do not affect one another. As our Supreme Court noted in Szczepanski, 141 N.J. at 358-59:

> [T]he reasonable counsel fee payable to the prevailing party under fee-shifting statutes is determined independently of the provisions of the fee agreement between that party and his or her counsel. The statutory-fee award may be comparable to or substantially different from the amount payable under a negotiated fee agreement. The agreement determines the fee payable by the prevailing party to counsel, and

24

might reflect the risks inherent in the litigation, the plaintiff's financial resources, and the prospect that counsel will receive a significant fee in the event of a large verdict but no fee at all if the suit is unsuccessful. The statutory-fee award determines the fee payable by the unsuccessful party to the prevailing party. As our opinion in Rendine emphasizes, the focus of that determination is to ascertain what fee is reasonable, taking into account the hours expended, the lawyer's customary hourly rate, the success achieved, the risk of nonpayment, and other material factors. 141 N.J. at 334-345. Although relevant, the fee payable under a contingent-fee agreement may bear little relation to the reasonable fee award authorized by statute, and in no event should the amount payable under the contingent-fee agreement serve as a ceiling on the amount payable by statute.

As such, the judge properly found that the absence of a retainer agreement itself did not preclude plaintiffs' right to an award of reasonable attorney's fees under the fee-shifting provision.

There was no dispute in this case as to the payment arrangement between plaintiffs and PQA, and as such, the lack of a written retainer agreement has no bearing on plaintiffs' entitlement to an award of reasonable attorney's fees and costs. The absence of a retainer agreement between plaintiffs and PQA did not affect what defendants, as the losing party, are obligated to pay under a fee-shifting provision because the arrangement between the parties expressly provided that fees were going to be sought pursuant to a fee-shifting provision.

Notwithstanding the absence of a retainer agreement, the judge analyzed the invoice and certifications submitted to determine whether the fees sought were reasonable. From reviewing the invoice, the judge was able to determine what work Pringle did as an attorney and struck those charges attributable to his work as a fact witness. Thus, in accordance with the applicable case law and Pringle's certification, the judge properly awarded attorney's fees in the absence of a retainer agreement or contingency agreement pursuant to a fee-shifting provision, which the plaintiffs agreed would be their sole avenue of recovering fees and costs.

V.

Defendants contend that while fee enhancements serve to attract competent counsel, Pringle needed no incentive to represent the Committee. Defendants argue that PQA incurred little to no risk representing the Committee because of the lack of novel and complex issues in this case, and PQA was not precluded from taking on other employment because the time and number of attorneys allocated to this matter was insignificant in light of the firm's size. Defendants further argue that the judge erred in awarding a forty percent contingency enhancement without considering that the fees will be paid from public funds and did not support her finding that the issues presented in this case

were novel and complex.  Defendants argue that given the lack of novel or complex issues, the low risk of nonpayment by pro bono clients, mitigation of economic risks, and Pringle's experience with the Faulkner Act, this case is "typical" and does not warrant a forty percent enhancement.

Once the lodestar has been determined, the judge must consider whether the fee should be enhanced "to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome."  Rendine, 141 N.J. at 337.  The Rendine Court adopted Justice Blackmun's dissent in Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 483 U.S. 711, 747 (1987) (Blackmun, J., dissenting), "that 'a court's job simply will be to determine whether a case was taken on a contingent basis, whether the attorney was able to mitigate the risk of nonpayment in any way, and whether other economic risks were aggravated by the contingency of payment[.]'"  Id. at 339.  This is so because "it is the actual risks or burdens that are borne by the lawyer or lawyers that determine whether an upward adjustment is called for."  Id. at 339-40 (quoting Delaware Valley, 483 U.S. at 747 (Blackmun, J., dissenting)).

Judges may also consider the legal risks inherent in the claim and order an additional enhancement where the result achieved "is significant and of broad

public interest." Id. at 328-29 (quoting Delaware Valley, 483 U.S. at 751 (Blackmun, J., dissenting)). Where "the likelihood of success is unusually strong, a court may properly consider the inherent strength of the prevailing party's claim in determining the amount of contingency enhancement[,]" thereby reducing or denying an enhancement. Id. at 341.

Judges should also consider "the public importance of the matter, the degree of success achieved, the high risk . . . of non-payment, and any other factors that support the attorney's request for an enhancement." New Jerseyans for a Death Penalty Moratorium, 185 N.J. at 158. "The enhancement 'ordinarily should range between five and fifty-percent of the lodestar fee, with the enhancement in typical contingency cases ranging between twenty and thirty-five percent of the lodestar.'" Ibid. (quoting Rendine, 141 N.J. at 343).

The Rendine Court recognized that "[d]etermination of the amount by which a lodestar fee should be enhanced to reflect the risk of nonpayment is conceptually difficult because there is 'no such thing as a market hourly rate in contingent litigation.'" 141 N.J. at 342. Finding that "fee awards of double the lodestar represent the high end of attorney fee awards under fee-shifting statutes," ibid., the Court "conclude[d] that contingency enhancements in fee-shifting cases ordinarily should range between five and fifty-percent of the

28

lodestar fee, with the enhancement in typical contingency cases ranging between twenty and thirty-five percent of the lodestar," id. at 343. Further, the Court held that "[s]uch enhancements should never exceed one-hundred percent of the lodestar, and an enhancement of that size will be appropriate only in the rare and exceptional case in which the risk of nonpayment has not been mitigated at all . . . ." Ibid.

Moreover, "[p]laintiff's status as a public entity is not a special circumstance warranting denial of an award." Dunn v. State, Dep't of Human Servs., 312 N.J. Super. 321, 335 (App. Div. 1998). In Hunter v. Trenton Hous. Auth., 304 N.J. Super. 70, 75 n.5 (App. Div. 1997), we emphasized that "the fact that the party to be charged is a taxpayer-supported state agency" did not bar the prevailing party's claim for counsel fees. Accordingly, the judge committed no error in declining to consider defendants' public entity status in awarding fees.

The judge also did not err by awarding a forty percent enhancement. Under the facts of this case, the enhancement was reasonable and not excessive. The judge correctly recognized the high risk of nonpayment to PQA given plaintiffs' agreement with the firm that the litigation would not cost them anything and PQA would rely entirely on the NJCRA's fee-shifting provision to seek an award of reasonable fees and costs if plaintiffs prevailed.

29

The judge also recognized the public importance of the matter, which protected plaintiffs' rights under the provisions of the Faulkner Act governing referendum petitions resulting in a special election benefiting the whole electorate. "[T]he right of referendum is about enfranchisement, about self-government, and about giving citizens the right to vote on matters of importance to their community." Tumpson, 218 N.J. at 480. "The referendum is direct democracy in its purest sense, allowing citizens to take an appeal above the heads of their elected officials and directly to the voters who can then approve or reject an ordinance at the polls." Ibid.

The judge also weighed all the factors in RPC 1.5(a), which provides that in assessing the reasonableness of an award, courts must consider:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent.

[Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 387 (2009)(quoting RPC 1.5(a)).]

The judge acknowledged the "immediate emergency time consuming effort" on appeal; the novel issues presented by the defenses; the high degree of skill required to perform the legal services properly; the high likelihood that representation in this matter would preclude other employment due to its emergent nature; the pace of the litigation; the prevailing rate of similar legal services in the relevant locality; the public importance and equitable nature of the relief sought; PQA's fee arrangement with plaintiffs centered on the fee-shifting provision of the NJCRA; and PQA's relationship with the clients and the experience, reputation and skill of the PQA attorneys.

Pringle outlined in his certification the express verbal fee arrangement PQA had with plaintiffs, which was contingent on prevailing and obtaining an award of fees under NJCRA. He submitted a copy of his biography detailing his education and thirty-two years of legal experience, and noted his relationship with plaintiffs included providing legal services in connection with other public

31

interest matters related to the Borough. He also noted that defendants' delay in complying with certain court orders resulted in additional litigation and attorney's fees.

Given that contingency awards at the high end of the range are appropriate in cases where there is no mechanism to mitigate the risk of non-payment, PQA was not able to mitigate the risk of nonpayment because its fees were dependent upon obtaining an award of fees under NJCRA, and the relief sought is primarily equitable in nature, a forty percent contingency enhancement was reasonable and appropriate in this case. The relief sought was equitable in nature and of broad public importance. PQA was not afforded the opportunity to mitigate the risk of non-payment because, in light of the relief sought, it could not expect to be compensated through a large contingent fee award nor could it expect that plaintiffs would be able to pay its fees when they prevailed.

For all of the foregoing reasons, we conclude the two awards of attorney's fees and costs were proper and not an abuse of discretion.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION